Martha L. WRIGHT,
*Plaintiff-Respondent,*

*v.*

John A. TURNER,
Freida Turner, and
Sherri L. Oliver,
*Defendants,*

*and*

MUTUAL OF ENUMCLAW INSURANCE COMPANY,
*Defendant-Appellant.*

Multnomah County Circuit Court
060403958; A144126

289 P3d 309

Thomas M. Christ argued the cause for appellant. With him on the briefs were Julie A. Smith and Cosgrave Vergeer Kester LLP.

Michael J. Walker argued the cause for respondent. With him on the brief were J. Philip Parks and Parks Bauer Sime Winkler & Fernety, LLP.

Before Armstrong, Presiding Judge, and Haselton, Chief Judge, and Duncan, Judge.

HASELTON, C. J.

## HASELTON, C. J.

In this automobile insurance coverage dispute, defendant, who provided underinsured motorist (UIM) coverage to plaintiff, appeals. The sole substantive issue presented for our consideration is whether, in the particular circumstances of this case—in which plaintiff was injured in a multiple-collision, three-vehicle incident—the trial court erred in failing to apply a provision of the UIM policy, limiting defendant's coverage to $500,000 "for bodily injury and property damage *resulting from any one automobile accident.*" (Emphasis added.)[1] We determine that the trial court did so err, and, accordingly, we reverse and remand, with an instruction to apply the $500,000 limit of liability to the judgment in plaintiff's favor.

The material facts are undisputed. On April 16, 2004, plaintiff and her friend Lorenz were traveling together northbound on Interstate 5 from California. As the women entered into Oregon, they encountered a hailstorm on Siskiyou Pass. The hail turned to rain as they descended a steep downgrade. Suddenly, a sedan, driven by Turner, lost control, spun, and collided with the front end of plaintiff's truck. The two vehicles separated momentarily—and then collided again—before both cars came to rest against a center barrier on the highway median, with both vehicles facing downhill and Turner's sedan "a few feet" in front of plaintiff's truck.

After the vehicles came to a stop, Lorenz and plaintiff checked on each other. Then Lorenz, who had been driving, attempted to exit the truck; however, she could not open the driver's door because the truck was positioned against the barrier. Lorenz pulled herself out of the truck through the driver's window and walked ahead to Turner's sedan to check on its occupants while plaintiff remained in the truck. Lorenz observed that Turner and his passenger appeared to need medical attention, so she returned to the truck to retrieve her cell phone to call 9-1-1. While standing outside of the truck, Lorenz implored plaintiff not to exit on the passenger's side because Lorenz feared that plaintiff would be

---

[1] Plaintiff raises a threshold objection of nonpreservation but, as explained below, 252 Or App at 29, we reject that challenge.

struck by passing traffic. Lorenz then leaned her head and shoulders into the driver's window and saw her purse on the floorboard, which she asked plaintiff to reach. Plaintiff unbuckled her seatbelt and, as she leaned over to reach the purse, a sports utility vehicle, driven by Oliver, struck the back of the truck. The rear-end impact pushed the truck into the sedan, causing Lorenz to be dragged forward and knocking plaintiff about the cab of the truck. Lorenz and plaintiff survived and received medical attention in Ashland.[2]

The collisions exacerbated plaintiff's preexisting spinal degenerative disease and caused emotional distress, for which plaintiff underwent multiple spinal surgeries and therapy. Seeking to recover for her substantial injuries and medical expenses, plaintiff brought an action against Turner and Oliver and sought to collect UIM benefits from defendant to the extent that the other drivers were underinsured. Plaintiff settled with Turner and Oliver, respectively, for a total of $175,000. However, plaintiff and defendant disputed both the amount of plaintiff's damages as a result of the April 16, 2004, incident and the extent of defendant's coverage.

As pertinent to this dispute, the UIM policy provides that defendant "will pay damages which the covered person is entitled to recover from the owner or operator of an uninsured motor vehicle because of [bodily injury and property damage] sustained by the covered person and caused by an accident." (Boldface omitted.)[3] The limit of liability provides:

"LIMIT OF LIABILITY

"A.   Single Limit

"1.   If the Declarations Page shows a single limit of liability for Part C—Uninsured Motorist Coverage, this

---

[2] The facts are derived from Lorenz's testimony, which is the only direct account of the April 16, 2004, incident in the record. At trial, plaintiff testified that she did not "remember all aspects of what happened in [the] accident," in part, because she was unconscious "for at least some period with each collision."

[3] Although the pertinent policy section is titled "uninsured motorist coverage," and the quoted provision refers to "an uninsured motor vehicle," the policy provides underinsured motorist coverage. *See* ORS 742.502(2)(a) ("Underinsurance coverage shall be equal to uninsured motorist coverage less the amount recovered from other motor vehicle liability insurance policies.").

limit is our maximum limit of liability for all damages for bodily injury and property damage *resulting from any one automobile accident.* This is the most we will pay regardless of the number of:

"a.   Covered persons;

"b.   Claims made;

"c.   Vehicles or premiums shown on the Declarations Page;

"d.   Premiums paid; or

"e.   *Vehicles involved in the accident.*"

(Boldface omitted; capitalization in original; emphases added.) The declarations page, in turn, provides, under the heading "COVERAGES AND LIMITS OF LIABILITY":

"UNINSURED MOTORISTS BODILY INJURY

"UNINSURED MOTORISTS PROPERTY DAMAGE

"SINGLE LIMIT EACH ACCIDENT            $500,000"

(Capitalization in original.)

In her first amended complaint, plaintiff alleged that "[t]he insurance contract provides for a limit of $1,000,000 of coverage for damage or injury caused by an underinsured motorist." Further, the prayer of that complaint sought "damages available in underinsured motorist coverage not to exceed $1,000,000."

In its answer, defendant admitted plaintiff's allegation as to coverage limits but denied, *inter alia,* plaintiff's allegations as to the extent of her damages and requested a jury trial "to determine the monetary value of plaintiff's claims." However, on the first day of trial, during a conference in chambers between the court and counsel before the jury was empanelled, defendant tendered an amended answer to plaintiff's first amended complaint in which defendant admitted only to "$500,000 of coverage for damage or injury caused by an underinsured motorist." Plaintiff did not oppose the amendment, and the court allowed it.

Defendant also moved *in limine* to prohibit plaintiff

> "from making any contractual type arguments such as breach of contract, payment of premiums, purchase of benefits, policy limits, or any other contract argument other than identifying this case as a claim which is allowed under the contract in order to resolve a dispute between the parties concerning the amount of damages which plaintiff would have been entitled to recover from [Turner] and [Oliver]."

The parties agreed to limit the jury's role, and the court summarized the pretrial agreement as follows:

> "I believe I can fairly state that[, in] our conference in chambers before we began the trial yesterday, there was a consensus that there were so many issues about what the limits were, and how confusing it would be to the jurors to know all these other peripheral issues that we just decided not to make any mention, as you heard me tell the jurors yesterday, not to make any mention of policy limits.
>
> *"We agree that it's a contract action because it's unclear whether under her insurance policy, there will be one coverage, or two; one policy limit, or two policy limits; whether they're one occurrence—I'm not even sure what the contract language looks like, but one occurrence or two occurrences; one accident, or two accidents; that we will wait until we see what the verdict looks like, and then we'll try and sort those issues out."*

(Emphasis added.)

Both parties generally agreed with the court's synopsis. Plaintiff's counsel requested clarification from the court that plaintiff would not be limited by the policy or the pleading in arguing the amount of damages. Defendant responded that,

> "if plaintiff is going to contend that there are two policies available, then there will have to be some determination of whether one policy was under-insured, and how much, and whether the other one was under-insured, how much, if [plaintiff's counsel] intends to split those in order to make two $500,000 claims."

Plaintiff opposed such a determination:

> "I think it's really too late at this point to change the course, and the whole nature of how the case is going to be tried, to—and then come in at the last minute and say, 'Well, we need to have the jury make a determination between the two accidents.'

> "[T]hat hasn't been pled or argued by the defendant, up to this point. The defendant's gone along with combining them in—in one case, and one pleading with regard to both accidents and both injuries—or, all the injuries.

> "* * * * *

> "So, I'm objecting to going down that road. I think it's impossible for the jury. Certainly it, impossible for the plaintiff at this point, without having some kind of a pleading, or some kind of bifurcation, or something where the issue was raised by the defendant."

Defendant remonstrated that it was "not the defendant's responsibility" to raise the issue of one versus two accidents; rather, it was plaintiff's burden to establish that two accidents had occurred under the terms of the policy in order to avail herself of two policy limits. Defendant further argued that plaintiff had at least implicitly raised the issue by claiming that defendant's liability was $1 million—the sum of two $500,000 policy limits.

The court rejected defendant's request to submit a verdict form that would apportion damages, and the court appeared to defer the issue of one versus two accidents for post-verdict determination. The court explained:

> "I'm not inclined to make the jury assess which damages are attributable to which injury. And, again, we may be crossing bridges that we don't even have to worry about crossing.

> "So, for now, * * * it's a one-answer question on the verdict form."

Near the close of trial, after instructing the jury, the court solicited exceptions to the jury instructions and verdict form. Plaintiff did not take any exception. Defendant took exception to the verdict form:

"Defendant has no exceptions to the instructions. I do except to the verdict form * * * in view of this argument about whether there are two impacts, and therefore two policy limits.

"And if we have come to a juncture where that becomes an issue, I wanted to submit [a verdict form that asks] the jury to assess the economic, and non-economic damages, resulting from the impact involving Mr. Turner, and the impact involving Ms. Oliver, because it may be that one of those [persons is] not under-insured.

"And so, as a consequence of that, if [the jury] had answered that question, * * * there may be only a minimal amount that would be owing on one policy as opposed to a larger amount on the other.

"But, as the Court knows, the benefits to which the plaintiff is entitled to is limited by the policy limitation amount.

"THE COURT:   Yeah. And we haven't even crossed that bridge.

"[DEFENSE COUNSEL]: And we haven't crossed that bridge yet, but I believe that that was the plaintiff's responsibility to establish that circumstance by testimony, and by submitting it to the jury in that fashion, in order to obtain the answer that, in order to make the two-policy argument. And I know the Court said that you weren't going to do that, and I [except to] the Court's ruling, and I think that's on the record, but I want—

"[THE COURT]:   I think so, too."

The jury returned a verdict in which it determined plaintiff's total damages to be $979,540, consisting of $750,000 in noneconomic damages and $229,540 in economic damages. Plaintiff then submitted a proposed general judgment, which included a money award of $804,540, reflecting an offset of $175,000 for the settlement payments made by Turner and Oliver. Defendant opposed entry of that judgment. According to defendant, "the verdict is insufficient to determine [defendant's] aggregate liability upon which judgment can be entered," because "there was no determination by the court regarding whether the events giving rise to plaintiff's claim constituted a single accident or two accidents under the policy" and "there was no

determination by a jury to apportion damages attributable to each accident[.]" Defendant argued that, "[i]n light of the undisputed factual circumstances and in light of the policy language," the court should conclude that there was only one accident under the policy and enter a judgment of $325,000—that is in the amount of a single $500,000 limit minus $175,000 to offset the payments by Oliver and Turner.

In response to defendant's objection, plaintiff argued that, because "[t]he trial jury was only asked to set an amount of compensation and nothing further," the trial court should enter a judgment that reflected the amount of the verdict.[4]

The trial court entered plaintiff's proposed judgment and explained its reasoning in a memorandum opinion:

"It was not until a colloquy between the court and counsel that the 'meaning' of defendant's answer on the amount of coverage became clear (both to plaintiff's counsel and to the court). I find that defendant's Answer to First Amended Complaint, filed April 9, 2009, either *expressly admitted* that the plaintiff had $1,000,000 in coverage or, alternatively, that defendant was *estopped from challenging the amount of coverage* on the first day of trial. I note that, in both Answers, defendant did not request a jury trial on the number of accidents, the amount of coverage (if that were a jury issue), or any issue *other than the 'monetary value of plaintiff's claims.'* And that is exactly what defendant got. Accordingly, the jury's verdict will be entered as a judgment.

---

[4] At that stage, plaintiff argued that "the number of accidents is *an issue of fact*" and that "[i]f the court concludes that it cannot direct a verdict, then factual findings need to be made before the court can apply its interpretation of the policy and make a determination regarding the number of 'accidents' that occurred." (Emphasis added.) On appeal, however, plaintiff takes a qualitatively different position—*viz.*, that the number of accidents is a question of law. Plaintiff no longer contends that further factual findings are necessary to decide the issue. At oral argument before this court, plaintiff's counsel opened by stating:

"I agree with [defense counsel] that the two accident issue is a matter of law. It is interpretation of an insurance policy: What does an insurance policy mean? *There are facts in the record already that you can make that determination on.*" (Emphasis added.)

"(Although the post-trial pleadings have addressed numerous legal issues, in light of the above finding, I write only to reflect on defendant's apportionment argument. Were there multiple defendants and/or insurance policies, the issue of apportionment between the accidents would be more important, if not critical. However, in this case, there is only one defendant * * *. Defendant has presented no reason why apportionment was necessary; allocation between the two accidents (the definition of which [is] not found in the policy) is a mere book keeping task. The first policy limit has an offset for the first tortfeasor's payment; the second policy limit has an offset for the second tortfeasor's payment. This court has found no persuasive authority that requires a jury to allocate claims when the insured and the insurance company are identical.)"

(Third emphasis in original; first and second emphases added.)

Defendant appeals from the general judgment. Defendant contends that the trial court erred in entering a judgment on the verdict without applying a single $500,000 per accident policy limit. In that regard, defendant contends, variously, that (a) it was not bound by its original answer because that answer was superseded by the amended answer; (b) it was not estopped from challenging the amount of coverage because "neither the insurer nor the insured can ever be estopped from relying on the terms of the policy to prove or disprove coverage"; and (c) a single policy limit applies because, as a matter of law, only one accident occurred and plaintiff failed to prove otherwise.

Defendant further contends that, if we conclude that only one accident occurred, the proper disposition is to reverse the judgment and remand to the trial court for entry of a new judgment that awards plaintiff $500,000 in damages less offsets for payments from the other parties.[5] Finally, and alternatively, defendant asserts that, even if we were to conclude that two accidents occurred, the trial court erred in failing to submit a verdict form that apportioned plaintiff's damages between the two purported accidents;

---

[5] In other words, if we conclude that a single policy limit applies, because there was only "one automobile *accident*," defendant does not request a new trial for damages to be apportioned between the two *collisions*.

thus, in that event, we should remand for a new trial that includes a causal apportionment of plaintiff's damages as between the two accidents.

Plaintiff does not attempt to defend the trial court's expressed rationale that defendant's initial answer to the first amended complaint either represented an enforceable "admission" of UIM coverage of up to $1 million or gave rise to "estoppel." Instead, plaintiff argues that defendant failed to preserve the issue of whether one or two accidents occurred, because defendant failed to move for a directed verdict on plaintiff's alleged failure to prove that her damages resulted from two separate accidents. Plaintiff further contends that, even if the issue is preserved, as a matter of law the evidence establishes that two accidents occurred and, thus, two policy limits are available.

As explained below, we conclude that (1) the "one accident versus two accidents" issue was sufficiently and timely raised for the trial court's consideration so as to be preserved for appellate review; and (2) on this record, as a matter of law, only one accident occurred. Thus, the trial court erred in failing to apply a single $500,000 coverage limit.[6]

At the outset, we hold that (as plaintiff implicitly recognizes) defendant is not bound by its original answer in which defendant admitted to a $1 million policy limit. The trial court expressly allowed defendant's amendment, which admitted to a policy limit of $500,000 per accident. Plaintiff did not object to the amendment. Thus, defendant's original answer had no continuing effect, either by way of admission or judicial estoppel, and the trial court erred in concluding otherwise. *See McGanty v. Staudenraus*, 321 Or 532, 538-39, 901 P2d 841 (1995) (citing *Yates v. Large*, 284 Or 217, 223, 585 P2d 697 (1978)) (a trial court may relieve a party from the effect of an admission in a pleading by allowing amendment of the pleading); *see also Venture Properties, Inc. v. Parker*, 223 Or App 321, 330 n 4, 195 P3d 470 (2008) ("Although a statement of fact in a pleading *that has not been superseded* is a judicial admission that the fact as stated exists, a party that repleads is not so bound." (Emphasis in original.)).

---

[6] Given that conclusion, we have no occasion to address the parties' dueling contentions regarding putative apportionment in the event of two accidents.

As another preliminary matter, we conclude that defendant's contentions pertaining to the number of accidents—and the sufficiency of plaintiff's proof in that regard—were preserved for our consideration. As we and the Supreme Court have repeatedly emphasized, the touchstone of preservation is that the trial court was afforded a reasonable opportunity to address the contention advanced on appeal. *See Peeples v. Lampert*, 345 Or 209, 219-23, 191 P3d 637 (2008). Here, as recounted at length above, that occurred. Specifically: (a) at the outset of trial, defendant raised the question of whether the circumstances established a single "accident" instead of multiple "accidents" and, thus, whether any recovery against defendant should be subject to a single $500,000 coverage limit; (b) the trial court deferred addressing and resolving that matter ("[W]e will wait until we see what the verdict looks like, and then we'll try and sort those issues out."); (c) the trial court reiterated that "wait-and-see" approach in the context of rejecting defendant's special verdict form ("[A]gain, we may be crossing bridges that we don't even have to worry about crossing."); and, finally, (d) after the jury returned its verdict, the court rejected defendant's renewed contention, albeit without addressing its substance. Preservation is patent.

We proceed to the merits. In doing so, we emphasize, at the outset, that the parties agree that, as framed on this record, the determination of whether plaintiff's injuries were the result of a single "accident" (as opposed to multiple "accidents") for UIM coverage purposes is purely legal and does not implicate any material factual dispute. Consequently, that question is properly resolved without the necessity of a remand to determine predicate factual questions pertaining to the circumstances of the April 16, 2004, incident. Ultimately, the resolution turns on the proper construction of the operative policy language—and, derivatively, on the particular application of that construction to the uncontroverted circumstances of the April 16, 2004, incident.

In *Holloway v. Republic Indemnity Co. of America*, 341 Or 642, 649-50, 147 P3d 329 (2006), the court summarized the applicable analytical framework:

"Interpretation of an insurance policy is a question of law, and our task is to ascertain the intention of the parties to the insurance policy. We determine the intention of the parties based on the terms and conditions of the insurance policy.

"If an insurance policy explicitly defines the phrase in question, we apply that definition. If the policy does not define the phrase in question, we resort to various aids of interpretation to discern the parties' intended meaning. Under that interpretive framework, we first consider whether the phrase in question has a plain meaning, *i.e.*, whether it is susceptible to only one plausible interpretation. If the phrase in question has a plain meaning, we will apply that meaning and conduct no further analysis. If the phrase in question has more than one plausible interpretation, we will proceed to the second interpretive aid. That is, we examine the phrase in light of the particular context in which that phrase is used in the policy and the broader context of the policy as a whole. If the ambiguity remains after the court has engaged in those analytical exercises, then any reasonable doubt as to the intended meaning of such a term will be resolved against the insurance company. However, as this court has stated consistently, a term is ambiguous *only* if two or more plausible interpretations of that term withstand scrutiny, *i.e.*, continue to be reasonable, despite our resort to the interpretive aids outlined above."

341 Or at 649-50 (internal quotation marks, citations, and brackets omitted; emphasis in original).

Significantly, although case law addressing the meaning of similar or analogous policy language *can* be informative, the utility of such decisional law (especially that of other jurisdictions) is highly variable and, in the final analysis, pertinent and persuasive only to the extent that it comports with the referent text and context. *Interstate Fire v. Archdiocese of Portland*, 318 Or 110, 117, 864 P2d 346 (1993); *see also id.* at 117 n 6 ("Case law and other authorities * * * are no substitute for a thorough examination of the policy in the first instance.").

We apply the foregoing interpretive framework to the phrase "any one automobile accident." The policy does not include a definition of "accident" or "any one automobile accident." That is unsurprising because, as the Supreme

Court observed in *Botts v. Hartford Acc. & Indem. Co.*, 284 Or 95, 103, 585 P2d 657 (1978), "[t]here is no such thing" as "one all-encompassing definition of 'accident' which accommodates all circumstances." Thus, the term must be analyzed with regard to the "particular factual circumstances in which the meaning of the terms is brought into question." *Id.* at 102. Consequently, we examine the operative language in context.

As noted, defendant agreed to "pay damages which [plaintiff] is entitled to recover from the owner or operator of an uninsured motor vehicle because of [bodily injury and property damage] sustained by [plaintiff] and caused by an accident."[7] The liability limitation provision, again, provides that a single $500,000 limit is defendant's "maximum limit of liability for all damages for bodily injury and property damage *resulting from any one automobile accident.*"[8] (Emphasis added.) Significantly, that provision continues with the following qualification: "This is the most we will pay *regardless of the number of * * * [v]ehicles involved in the accident.*" (Boldface omitted; emphasis added.)

Given that qualifying language, it is patent that the parties contemplated and understood that "any one automobile accident" *could* involve multiple other vehicles (besides the insured's vehicle)—and, hence, could involve multiple potentially tortious impacts. Bluntly, "any one automobile accident," implicating only a single limit of liability, can involve multiple vehicles, multiple collisions, and (again, potentially) multiple underinsured motorist tortfeasors. That abstract, contextually compelled premise is, however, hardly conclusive. The mere fact that "one automobile accident" *can* involve multiple vehicles and

---

[7] In the context of insurance policies covering property damage "caused by accident," the Supreme Court has explained that "an 'accident' is an incident or occurrence that happened by chance, without design and contrary to intention and expectation." *St. Paul Fire v. McCormick & Baxter Creosoting*, 324 Or 184, 206, 923 P2d 1200 (1996) (internal quotation marks omitted). Although that broad definition of "accident" informs the understanding of the general nature of any automobile "accident"—that is, what distinguishes an "accident" from a "non-accident"—it is of little assistance in determining what distinguishes a single accident from multiple accidents.

[8] Again, as noted, the policy's declarations page provides that the "COVERAGE[] AND LIABILITY LIMIT[]" for the UIM policy is a "SINGLE LIMIT" for "EACH ACCIDENT" of $500,000.

multiple collisions—that is, that *some* single accidents can involve such circumstances—does not mean, logically or practically, that *all* events involving multiple vehicles colliding with the insured's vehicle constitute only "one automobile accident" (triggering only one coverage limit).

The policy's text in context offers no further guidance on resolving that question—*viz.*, in what circumstances do incidents involving multiple vehicles colliding with the insured's vehicle constitute multiple accidents rather than "any one accident"?—on which the coverage determination depends. Accordingly, we turn, finally and unavoidably, to decisional law for assistance in construing the critical language. *Interstate Fire*, 318 Or at 117. Ultimately, as we will explain, we find the reasoning of *United Servs. Auto Ass'n v. Baggett*, 209 Cal App 3d 1387 (1989), to be persuasive and adopt that construction.

*Baggett* involved very similar circumstances— the plaintiffs' decedent was killed in an incident involving two successive collisions by different vehicles—and the construction and application of almost identical language, albeit with respect to liability, not UIM, coverage. There, a vehicle operated by a driver insured under the disputed liability policy, struck the decedent's vehicle from behind on a freeway. 209 Cal App 3d at 1390. The decedent and the (liability) insured driver drove a short distance and then parked in the median to discuss the collision. *Id.* The decedent and insured driver stood outside of their vehicles talking and, within a minute, a third vehicle struck the insured's vehicle from behind, pushing it into the decedent and her vehicle, killing the decedent. *Id.*

The decedent's heirs filed an action against the insured for wrongful death and property damages. *Id.* at 1389. The insured's liability coverage included limits of $100,000 "for all damages for bodily injury sustained by any one person in *any one auto accident*," and $300,000 "for all damages for bodily injury resulting from *any one auto accident*." *Id.* at 1390 (emphasis added). The policy further provided (like the UIM coverage here) that those limits applied "regardless of the number of * * * vehicles involved in the auto accident." *Id.* The parties disputed whether

the circumstances that resulted in the decedent's death constituted one "accident" or two, which would implicate multiple limits under the liability coverage. Specifically, the decedent's heirs contended that the insured had (1) caused the initial collision (the purported "first accident") by his negligent driving and (2) also tortiously contributed to/caused the subsequent collision (the purported "second accident") by negligently failing to, *e.g.*, undertake warning measures and "direct[ ] traffic around the stopped vehicles" after the initial collision. *Id.*

The liability insurer filed a declaratory judgment action, seeking resolution of that coverage dispute, and the trial court, by summary judgment, resolved that question in the insurer's favor, concluding that only one "accident" had occurred and, thus, only one policy limit applied. *Id.* at 1391.

The Court of Appeal affirmed. In doing so, the court noted contextually (as we have here) the policy's provision that the limits of liability for "any one auto accident" applied regardless of the number of claims made or vehicles involved—and reasoned, consequently, that "[t]he policy thus contemplates one accident involving several vehicles." *Id.* at 1394. The court also reviewed cases from California and other jurisdictions in which courts had interpreted similar policy limitations and summarized their reasoning as follows:

> "[A] single uninterrupted course of conduct which gives rise to a number of injuries or incidents of property damage is one 'accident' or 'occurrence.' On the other hand, if the original cause is interrupted or replaced by another cause, there is more than one 'accident' or 'occurrence.'"

*Id.* at 1393 (internal quotation marks omitted).

The court acknowledged that many of the decisions that it had canvassed could be characterized as "involving simply one negligent act of driving by the [liability] insured," whereas the underlying circumstances in *Baggett* involved "two negligent acts by [the] insured," each causing a separate collision. *Id.* at 1394. Nevertheless, the court rejected the categorical proposition that separate negligent acts necessarily result in separate "accidents." *Id.* at 1395.

Rather, "[i]f cause and result are so simultaneous or so closely linked in time and space as to be considered by the average person as one event, courts adopting the cause analysis uniformly find a single occurrence or accident." *Id.* at 1394 (internal quotation marks omitted). Consistently with that premise, the court ultimately concluded that "the insurance policy provisions limiting maximum liability 'for any one auto accident' unambiguously contemplate two consecutive collisions as occurred here to be one accident." *Id.* at 1396.

We do not understand plaintiff here to ultimately dispute the abstract correctness of the proximate cause-driven construct of "any one accident" as expressed in *Baggett*, specifically including its proviso as to the spatial and temporal proximity of the initial and subsequent impacts involving separate vehicles. Rather, plaintiff contends that the proper *application* of that construct here compels the conclusion that plaintiff was injured as the result of two accidents, not one.[9] In that regard, plaintiff particularly invokes *Liberty Mutual Ins. Co. v. Rawls*, 404 F2d 880 (5th Cir 1968), and *Illinois National Insurance Co. v. Szczepkowicz*, 542 NE 2d 90 (Ill App 1989).

In *Rawls*, the insured driver, who was driving northbound on a highway at high speeds attempting to elude the police, collided with the rear of a northbound automobile, "knock[ing] it off the highway." 404 F2d at 880. The insured driver then continued northward, veered across the center lane, and collided head-on with a southbound vehicle. The tortfeasor driver's liability insurance policy provided that $20,000 was "'the total limit of the company's liability *** as the result of any one accident.'" *Id.* The insurance company settled with the occupants of the second car for $20,000, and, in subsequent litigation against the insured, the occupants of the first car contended that that settlement had not exhausted coverage limits because there had been two accidents, not one. *Id.* The district court, on stipulated facts and by way of summary judgment, concluded that there had been two accidents. *Id.* The Fifth Circuit affirmed:

---

[9] Indeed, plaintiff contends that the court in *Baggett* itself erred in its particular application of that formulation given that (in plaintiff's characterization) the two collisions in *Baggett* were "separated by a significant period of time."

"According to the agreed facts, the impact between the [insured] automobile and the Rawls automobile was separated from the impact between the [insured] automobile and the Davis automobile by both time and distance. These impacts occurred 2 to 5 seconds apart and 30 to 300 feet apart. There were two distinct collisions, or more than a single sudden collision. There is no evidence that the [insured] automobile went out of control after striking the rear end of [Rawls's] automobile. On the contrary, the only reasonable inference is that [insured] had control of his vehicle after the initial collision."

Accordingly, "there were, in law, two accidents." *Id.* at 881.[10]

In *Szczepkowicz*, another declaratory judgment action, the insured truck driver had attempted, in foggy conditions, to cross over the median of a four-lane highway. 542 NE 2d at 91. The insured driver stopped with the rear portion of the driver's tractor-trailer in the northbound traffic lanes, and a northbound vehicle collided with the rear of the trailer. *Id.* The insured truck driver then "moved forward approximately 12 feet 'almost immediately' after the collision, and then stopped again"; however, the trailer continued to block the northbound lanes. Five minutes later, another northbound vehicle collided with the trailer. *Id.* The occupants of both vehicles sought to recover for their injuries, implicating the liability policy's coverage limits of $300,000 for one accident. *Id.*

The trial court, on summary judgment, concluded that there had been two accidents. *Id.* at 91. The appellate court, adopting the same (proximate) "cause theory" as in *Baggett*, observed:

"Courts applying the cause theory uniformly find a single accident if cause and result are so simultaneous or so closely linked in time and space as to be considered by the average person as one event."

---

[10] The court explained that the trial court could have reached the same conclusion under either the "causation theory," under which the court circumscribes an accident "from the standpoint of conduct forming the causative act," or under the "effect theory," under which the court makes that determination "from the point of view of a person sustaining injury." 404 F2d at 881.

*Id.* at 92 (internal quotation marks omitted). The court then canvassed case law from other states and noted that, generally, two accidents occur where collisions are separated by time and distance *and* the cause of the subsequent collision is distinct; conversely, only one accident occurs where separate collisions are "almost instantaneously" *and* the subsequent impact was caused by the first impact. *Id.* at 93. Applying the cause theory, the court concluded that two accidents had occurred. *Id.*

Here, plaintiff argues that, as a matter of law under the reasoning in *Rawls* and *Szczepkowicz*, two accidents occurred in this case because the evidence establishes that the initial collision with the first vehicle (driven by Turner), which caused the UIM-insured vehicle to come to rest against the center barrier, and the subsequent collision with the second vehicle (driven by Oliver), while plaintiff was still in the insured vehicle, were "separated by time and space" and because the driver (Lorenz) resumed control of the UIM-insured vehicle during the interval between the impacts.

On this record, we respectfully disagree.

In that regard, we emphasize two overarching and, ultimately, dispositive considerations. The first is the proper allocation of the burden of production and persuasion as to establishing coverage—and specifically, the availability of coverage for multiple "accidents." Because, "[u]nder Oregon law, the initial burden of proving coverage is on the insured[,]" *Employers Insurance of Wausau v. Tektronix, Inc.*, 211 Or App 485, 509, 156 P3d 105, *rev den*, 343 Or 363 (2007), plaintiff had the burden of presentation and persuasion as to whether there were two accidents, instead of one.[11] Accordingly, plaintiff had the burden of adducing proof sufficient to substantiate a determination that the two collisions arose from distinct causation—that is, the latter was not merely proximately derivative of the causation of the former.

---

[11] Plaintiff does not contradict the allocation of that burden. Indeed, at oral argument we inquired, "Ultimately, is it the plaintiff's burden of proof to demonstrate two accidents instead of one in this case?" Plaintiff's counsel responded, "Yes, Your Honor, I think it would be."

Second, and equally critical, is the idiosyncratic posture of this case. Plaintiff does not contend that, given the trial court's erroneous rationale for failing to entertain the merits of the "one accident versus two" issue, a remand is required, or even would be appropriate, for the presentation (for the trial court's initial consideration) of further evidence pertaining to that question or for the resolution of any possible disputed issue of fact. Indeed, as noted, *see* 253 Or App at 26 n 4, plaintiff has, on appeal, explicitly disavowed such a disposition.

Thus, in the hackneyed, but here apt, phrase, the record "is what it is." And plaintiff, as the party with the burden of presentation and persuasion with respect to establishing the availability of coverage for two accidents instead of one, was obligated at least to adduce *prima facie* evidence that the second collision was not merely proximately derivative of the causation of the first.

Plaintiff failed to meet that *prima facie* burden. That is so because the record is completely devoid of any evidence regarding the cause of the second collision. The record reveals only that the plaintiff's truck came to rest pinned against a barrier on the center median and that Lorenz was concerned that, if plaintiff got out on the passenger side, she might be injured by passing traffic. No evidence reveals what caused the second vehicle to collide with plaintiff's truck.

Further, to the extent that (as recognized in *Baggett* and other decisions) distinct causation can be circumstantially inferred from substantial temporal or spatial attenuation of the separate collisions, the record here was legally insufficient to support such an inference. The time between the two successive collisions was brief—almost certainly akin to the time in *Baggett*—and the record does not disclose the distance between the points of impact. On this record, any inference as to the causal dynamics of the second collision would be impermissibly speculative.[12]

---

[12] Finally, as noted, plaintiff posits that the fact that Lorenz retained (or at least regained) control of the UIM-insured vehicle between the collisions is probative of whether two accidents occurred. *See* 253 Or App at 36. That contention, predicated on *Rawls* and *Szczepkowicz*, is unavailing here. In both of those cases, the insured driver's continued control of his vehicle indicated that the first collision did not cause the second collision. Here, in material contrast, plaintiff was a passenger in

In sum, this limited record is insufficient to support a determination of multiple "accidents" for purposes of UIM coverage. Accordingly, the trial court erred in failing to apply a single policy limit of $500,000.

Reversed and remanded with instruction to apply $500,000 limit of liability to judgment in plaintiff's favor.

---

a vehicle that was struck by two different vehicles. Lorenz's control of the truck in which plaintiff was injured had no bearing on the causal connection (or lack thereof) between the collision with Turner and the collision with Oliver.