Argued and submitted September 19, 2013, decision of the Court of Appeals is reversed, judgment of the circuit court is reversed, and case remanded to the circuit court for further proceedings February 20, 2014

Martha L. WRIGHT,
*Petitioner on Review,*

*v.*

John A. TURNER,
Freida Turner,
and Sherri L. Oliver,
*Defendants,*

*and*

MUTUAL OF ENUMCLAW
INSURANCE COMPANY,
*Respondent on Review.*

(CC 060403958; CA A144126; SC S060960)

322 P3d 476

Rick J. Glantz, Vick & Glantz, LLP, Salem, argued the cause and filed the brief for petitioner on review.

Thomas M. Christ, Cosgrave Vergeer Kester LLP, Portland, argued the cause and filed the brief for respondent on review.

Meagan A. Flynn, Portland, and Lisa T. Hunt, Law Offices of Lisa T Hunt, LLC, Portland, jointly filed a brief for *amicus curiae* Oregon Trial Lawyers Association.

WALTERS, J.

**WALTERS, J.**

Plaintiff was injured when one negligent driver and then, in short succession, another negligent driver collided with the truck in which plaintiff was a passenger. The underinsured motorist benefits available to plaintiff under the terms of the insurance policy that she purchased from defendant depend on the meaning of the term "accident" as that term was used in that policy and is used in corresponding Oregon financial responsibility statutes. We conclude that the legislature intended that the term "accident" have its ordinary meaning and that plaintiff presented evidence from which a jury could find that her injuries had been incurred in more than one "accident." Consequently, we reverse the decision of the Court of Appeals and remand to the trial court for further proceedings.

The procedural facts in this case are idiosyncratic and are set forth in detail in the Court of Appeals opinion. *Wright v. Turner*, 253 Or App 18, 22-27, 289 P3d 309 (2012). For purposes of our review, it is sufficient to recount that plaintiff filed a complaint against her insurer, defendant Mutual of Enumclaw, seeking underinsured motorist benefits of $979,540. The trial court submitted the question of the amount of plaintiff's damages to a jury, but denied defendant's request that the jury also decide the number of accidents that had occurred. The court reasoned that defendant had failed to raise, or was estopped from raising, an argument that plaintiff's damages had been incurred in one "accident" and that, by the terms of the insurance policy, defendant's liability could not exceed $500,000. The jury returned a verdict for the prayer, and the trial court entered judgment in that sum. On appeal, defendant argued that the trial court had erred in precluding it from litigating the number of accidents that had occurred, and that, "as a matter of law, there was only one accident, and plaintiff had failed to plead or prove otherwise." The Court of Appeals agreed with both arguments. *Id.* at 28. On review, plaintiff contends that defendant's first argument was unpreserved and that defendant's second argument fails on the merits. We decline to address the preservation issue. Instead, we consider plaintiff's contention that the Court of Appeals

erred in deciding that plaintiff had not adduced evidence from which a jury could find that more than one "accident" had occurred.

The undisputed facts relevant to that question are as follows. In 2004, plaintiff was a passenger in a truck traveling north on Interstate 5 in a storm of hail and rain. As the truck was descending a steep grade, a vehicle ahead, driven by Turner, spun out of control and collided with the truck. The truck came to a stop on the median strip of the highway, resting against a concrete barrier that blocked the driver's side door. The driver of the truck climbed out her window, told plaintiff to remain inside the truck, and went to check on Turner. The driver then returned to the truck and asked plaintiff to retrieve the driver's cell phone so that the driver could call for help.

During that interval, a number of other vehicles passed the truck without colliding with it. At some point, a second vehicle, driven by Oliver, collided with the truck, pushing it farther down the highway.[1] As a result of the collisions, plaintiff suffered injuries that required multiple surgeries and ongoing treatment.

Plaintiff had purchased underinsured motorist insurance (UIM) from defendant Mutual of Enumclaw. Her policy comported with the requirements of ORS 806.070 and ORS 742.502 through 742.508, which establish required amounts of coverage for Oregon drivers. Her policy provided coverage for damages caused by underinsured motorists up to a limit of $500,000 "for bodily injury and property damage resulting from *any one automobile accident* * * * regardless of the number of * * * vehicles involved in the automobile accident." (Emphasis added.)

Plaintiff filed an action against three defendants— Turner, Oliver, and her insurer, Mutual of Enumclaw. She alleged that both Turner and Oliver had been negligent and that they did not have sufficient insurance to cover her damages; she therefore alleged that Mutual of Enumclaw was liable under the terms of its policy up to a limit of $1 million.

---

[1] Neither the amount of time that passed between the two collisions nor the distance between the two impacts was established at trial.

Plaintiff settled with Turner and Oliver for the total amount of their insurance policies, and the case was dismissed as to them. Defendant Mutual of Enumclaw (defendant) filed an answer admitting that both Turner and Oliver were negligent, but contesting plaintiff's damages as well as the extent of its liability for those damages. As noted, the trial court entered judgment against defendant for $979,540.

On appeal, the parties and the Court of Appeals considered whether plaintiff had been injured in one "accident" to be a matter of contractual interpretation and applied the methodology for interpreting insurance policies set out in *Holloway v. Republic Indemnity Co. of America*, 341 Or 642, 649-50, 147 P3d 329 (2006). Determining that the policy term "accident" was undefined and that, in the context presented, the meaning of that term was a question of first impression in Oregon, the Court of Appeals considered a California court's interpretation of a similar contract provision to be persuasive. In *United Services Automobile Assn. v. Baggett*, 209 Cal App 3d 1387, 1393, 258 Cal Rptr 52 (1989), the California Court of Appeal interpreted the term "accident" to mean "a single uninterrupted course of conduct" giving rise to injury and explained that, when the "original cause is interrupted or replaced by another cause, there is more than one 'accident.'" *Id.*

Persuaded by *Baggett*, the Court of Appeals concluded that plaintiff had not met her burden to show that the two collisions had distinct causes and that the second collision was "not merely proximately derivative" of the first. *Wright*, 253 Or App at 37. The court determined that the record was "devoid of any evidence regarding the cause of the second collision," *id.*, and, therefore, "as a matter of law, only one accident occurred." *Id.* at 28. The court therefore reversed the trial court's judgment and remanded with instructions to apply the $500,000 liability limit to the judgment.

In this court, plaintiff argues that the Court of Appeals was correct to interpret the contractual term one "accident" as the California court did in *Baggett*, but that the Court of Appeals erred in its application of that interpretation to the facts in this case. Defendant urges that we adopt the reasoning of the Court of Appeals in its entirety.

Although both parties approach the problem as one of contractual interpretation, we think it necessary to correct course. The contractual provision at issue here is a statutorily required provision, and, as a result, "we attempt to determine the legislature's intention in enacting that statute rather than the parties' contractual intention in entering into the insurance contract." *Fox v. Country Mutual Ins. Co.*, 327 Or 500, 506, 964 P2d 997 (1998); *see also Moore v. Mut. of Enumclaw Ins. Co.*, 317 Or 235, 244-45, 855 P2d 626 (1993) (where "the language that we must interpret appears in the [insurance] contract because the legislature requires it[,] * * * we must necessarily determine, if possible, the meaning intended by the legislature").

Oregon statutes require all drivers in the state to demonstrate minimum levels of financial responsibility for any damages that they may cause while operating a motor vehicle. *See Viking Ins. Co. v. Perotti*, 308 Or 623, 628, 784 P2d 1081 (1989) ("The motor vehicle liability insurance statutes * * * and the [Financial Responsibility Law], ORS chapter 806, provide a comprehensive scheme under which both drivers and vehicle owners are required to have liability insurance or a permissible substitute therefor."). The bulk of those requirements are set out in ORS chapter 742. ORS 742.502 requires that Oregon automobile liability insurance policies include coverage for damages caused by both uninsured (UM) and underinsured (UIM) drivers.[2] The limits for UM and UIM coverage must be the same as for bodily injury

---

[2] ORS 742.502 provides, in part:

"(1) Every motor vehicle liability policy insuring against loss suffered by any natural person resulting from liability imposed by law for bodily injury or death arising out of the ownership, maintenance or use of a motor vehicle shall provide in the policy or by indorsement on the policy uninsured motorist coverage * * *.

"(2)(a) A motor vehicle bodily injury liability policy shall have the same limits for uninsured motorist coverage as for bodily injury liability coverage unless a named insured in writing elects lower limits. The insured may not elect limits lower than the amounts prescribed to meet the requirements of ORS 806.070 for bodily injury or death. Uninsured motorist coverage shall include underinsurance coverage for bodily injury or death caused by accident and arising out of the ownership, maintenance or use of a motor vehicle with motor vehicle liability insurance that provides recovery in an amount that is less than the insured's uninsured motorist coverage. Underinsurance coverage shall be equal to uninsured motorist coverage less the amount recovered from other motor vehicle liability insurance policies."

liability coverage unless a named insured in writing elects lower limits. ORS 742.502(2)(a). ORS 742.504 sets out the terms that must appear in any insurance policy to comply with the terms of ORS 742.502. ORS 742.504(7)(a) provides that "the limit of liability stated in the declarations as applicable to 'each accident' is the total limit of the company's liability for all damages because of bodily injury sustained by two or more persons as the result of any one accident."

The minimum required coverage in ORS chapter 742 is defined by reference to the financial responsibility requirements specified in ORS chapter 806. ORS 806.070 establishes a schedule of payments and requires that insurance policies must provide for payment of at least those amounts to meet the financial responsibility requirements of ORS chapter 806. The schedule of payments is $25,000 for bodily injury to or death of one person in "any one accident," and $50,000 for bodily injury to or death of two or more persons in "any one accident." ORS 806.070. Thus, Oregon automobile insurance policies must provide liability, UM, and UIM coverage that meets minimum levels of recovery for damages sustained as a result of "any one accident."

Accordingly, the policy that plaintiff purchased from defendant was required by statute to provide a minimum level of UIM coverage for damages caused in "any one accident." Because the insurance policy that defendant issued to plaintiff was required to meet the statutory minimum coverage for "any one accident," the legislature's intended definition of that phrase and the term "accident," as used in that context, controls the meaning of that phrase and, in particular, that term. *See Moore*, 317 Or 244-45 (requiring that mode of analysis). Therefore, our task is to determine the legislature's intent, rather than the intent of the parties in agreeing to the terms of the insurance policy. *See Fox*, 327 Or at 506 (when analyzing policy that is statutorily mandated, court should interpret policy according to legislature's intent, not understanding of parties to contract).

Following the familiar methodology for statutory interpretation as laid out in *State v. Gaines*, 346 Or 160, 171-72, 206 P3d 1042 (2009), and *PGE v. Bureau of Labor & Industries*, 317 Or 606, 610-12, 859 P2d 1143 (1993), we look

first to the text and context of the statutes in question. That analysis includes other provisions of the statutes and other related statutes, as well as their enactment history. *Sanders v. Oregon Pacific States Ins. Co.*, 314 Or 521, 527, 840 P2d 87 (1992).

Neither ORS 806.070 nor related statutes define "accident." The predecessor to ORS 806.070, *former* ORS 486.015 (1951), was enacted in 1951 when the legislature simultaneously enacted a number of statutes requiring that individuals responsible for accidents demonstrate their ability to pay certain minimum compensation to those harmed in "any one accident."[3] In 1951, the legislature also did not define "accident."

At that time, the relevant dictionary definition of "accident" was "[a]n event that takes place without one's foresight or expectation; an undesigned, sudden, and unexpected event. * * * Hence, often, an undesigned and unforeseen occurrence of an afflictive or unfortunate character; a mishap resulting in injury to a person or damage to a thing; a casualty * * *." *Webster's Second New Int'l Dictionary* 15 (unabridged ed 1959) (first printing 1936). Similarly, *Black's Law Dictionary* 30 (4th ed 1957) (first printing 1951) included a definition of "accident" as "an unusual, fortuitous, unexpected, unforeseen or unlooked for event, happening or occurrence * * * any unpleasant or unfortunate occurrence, that causes injury, loss, suffering or death[.]" In the specific context of automobiles, *Black's* defined "accident" as "an untoward and unforeseen occurrence in the operation of the automobile which results in injury to the person or property of another." *Id*. at 31.

As the Court of Appeals explained in the context of interpreting plaintiff's insurance policy, those broad definitions provide an "understanding of the general nature of any automobile 'accident'—that is, what distinguishes an 'accident' from a 'non-accident.'" *Wright*, 253 Or App at 31 n 7. They also provide, however, some assistance in distinguishing a single accident from multiple accidents: They define

___

[3] ORS 806.070 has been renumbered several times, but not substantively altered for our purposes, except to increase the minimum amounts of coverage required for damages resulting from "any one accident."

"accident" in terms of an "event," "happening," or "occurrence." Thus, we glean from those definitions that one "accident" means one unexpected event, happening, or occurrence.

The context of *former* ORS 486.015 (1951) also is of assistance. That statute required minimum coverage for damages "because of bodily injury to or death of two or more persons in any one accident."[4] Thus, it is obvious that the legislature contemplated that one "accident" could involve the injury or death of "two or more persons." The number of accidents does not, therefore, turn on the number of persons who are injured.

That still does not tell us, definitively, what the legislature meant by the term "accident," and we turn to legislative history. As noted, the legislature first required that individuals responsible for accidents demonstrate their ability to pay certain minimum compensation to those harmed in "any one accident" in 1951, with the enactment of *former* ORS 486.015 (1951).

The committee discussions at the time that the legislature passed *former* ORS 486.015 (1951) suggest that that statute was based on similar financial responsibility laws passed in other states, which in turn were based on a model act. One of the sponsors of the bill testified before the Senate Financial Affairs Committee that that bill was "very much like the California Bill which was drawn after the model financial responsibility bill." Minutes, Senate Financial Affairs Committee, SB 285, Mar 8, 1951, 2 (statement of Ray Kell).[5] The bill's sponsor also stated that the

---

[4] *Former* ORS 486.015 (1951) provided, in part:

"(2) 'Proof of financial responsibility' means proof of ability to respond in damages for liability, on account of accidents occurring subsequent to the effective date of the proof, arising out of the ownership, operation, maintenance or use of a vehicle * * * in the amount of

"(a) $5,000 because of bodily injury to or death of any one person in any one accident;

"(b) Subject to that limit for one person, $10,000 because of bodily injury to or death of two or more persons in any one accident; and

"(c) $1,000 because of injury to or destruction of the property of others in any one accident."

[5] Because no audio recording is available, we quote from the minutes.

proposed statute "was the same law that they had in New York." Minutes, Senate Financial Affairs Committee, SB 285, Mar 15, 1951, 1 (statement of Ray Kell). The laws of both California and New York were based on the American Automobile Association's Model Safety-Responsibility Bill of 1943, which was intended for nationwide enactment. *See* Joseph P. Murphy and Ross D. Netherton, *Public Responsibility and the Uninsured Motorist*, 47 Geo LJ 700, 706 n 20, 705-06 (1959) (discussing national passage of the provisions of the model act and identifying the source of the model act). *See also* Hugh Neill Johnson, *The Modern Trend in Financial Responsibility Legislation*, 1944 ABA Sec Ins Negl & Comp L Proc 67, 70 (1944) (including digest of model bill).

After the passage of *former* ORS 486.015 in 1951, subsequent legislatures continued to use the term "accident." In 1959, the legislature first required that all motorists in Oregon carry insurance against damages caused by uninsured motorists.[6] The UM statute incorporated the terms of the financial responsibility statute by reference and thus also made coverage dependent on the number of accidents that had occurred.[7] The term "accident" was used in the UM statute itself in 1967, when the legislature enacted the statute that is now codified as ORS 742.504, establishing minimum levels of required coverage for damage resulting

---

[6] *Former* ORS 736.317 (1959), now codified at ORS 742.504, provided, in part:

"No policy insuring against loss resulting from liability imposed by law for bodily injury or death * * * arising out of the ownership, maintenance or use of a motor vehicle * * * shall be issued or delivered in this state * * * unless the policy includes [coverage] * * * for the protection of persons insured thereunder who are legally entitled to recover damages from owners or operators of uninsured motor vehicles * * *. Coverage shall not be less than the amounts or limits prescribed for a policy meeting the requirements of ORS chapter 486."

[7] Like Oregon, many of the states that adopted the model policy on which Oregon's UM statute was based also used the limiting phrase "one accident" by reference to their already-existing financial responsibility statutes. *See, e.g.,* Cal Ins Code § 11580.2 (1959) (policies must provide UM coverage "at least equal to financial responsibility requirements"); Ill Comp Stat § 143(a) (1959) (same); Ga Code Ann § 56-407A (1959) (UM policy limited to damages caused by "one accident"). *See also* James H. Donaldson, *Uninsured Motorist Coverage*, 34 Ins Counsel J 57, 58 (1967) (discussing particular state provisions); Alan I. Widiss, *Perspectives on Uninsured Motorist Coverage*, 62 NW U L Rev 497, 499 n 10 (1967) ("Insurance companies are now required to offer uninsured motorist coverage in 40 states.").

from one "accident."[8] Finally, in 1981, the legislature required that UM policies also include UIM coverage.[9] ORS 743.789 (1981) specified the required minimum coverage by reference to the requirements for UM coverage as stated in ORS 743.792 (1981) (now codified as ORS 742.504), and thus included that statute's one "accident" coverage requirements.

As that history reveals, when the legislature originally used the term "accident," it took it from statutes in other states and a model act intended for nationwide enactment. We therefore assume that the legislature contemplated that that term would reflect its national understanding, and we think it fair to consult, for their persuasive value, judicial interpretations of that term that would have been available to the legislature at that time. *See State ex rel. Western Seed v. Campbell*, 250 Or 262, 270-71, 442 P2d 215 (1968) ("When one state borrows a statute from another state, the interpretation of the borrowed statute by the courts of the earlier enacting state ordinarily is persuasive.").

In 1951, when the legislature first used the term "accident," there were two leading cases defining that term for the purpose of determining the number of accidents that had occurred. *See* Lee R. Russ and Thomas Segallas, 12 *Couch on Insurance* 3d at §§ 172:12, 172:13 (3d ed 1995) (discussing cases); *The Meaning of the Word "Accident" in a Liability Insurance Policy*, 26 Fordham L Rev 506, 508-510 (1957) (same). *Anchor Cas. Co. v. McCaleb*, 178 F2d 322 (5th Cir 1949), involved the explosion of an oil well that caused damage to a number of property owners. The defendant insurance company argued that only one accident had occurred and that the recovery of all the injured plaintiffs therefore was subject to the policy limit of $5,000 for each

---

[8] *Former* ORS 743.792 (1967) provided, in part:

"(7)(a) The limit of liability stated in the declarations as applicable to 'each person' is the limit of the insurer's liability for all damages because of bodily injury sustained by one person as the result of any one accident, and, subject to the above provision respecting each person, the limit of liability stated in the declarations as applicable to 'each accident' is the total limit of the company's liability for all damages because of bodily injury sustained by two or more persons as the result of any one accident."

[9] *Former* ORS 743.789 (1981), now codified as ORS 742.502, provided, in part, that "[u]nderinsurance coverage shall be equal to uninsured motorist coverage less the amount recovered from other motor vehicle liability insurance policies."

"accident." *McCaleb*, 178 F2d at 324. The Fifth Circuit held instead that "'accident,' as used in the policy, must be construed from the point of view of the person whose property was injured. * * * If one cause operates upon several at one time, it cannot be regarded as a single incident, but the injury to each individual is a separate accident." *Id.* at 324-25. Commentators have referred to that interpretation as the "effects theory," meaning that the number of accidents is determined from the perspective of the person injured and that there are as many accidents as there are persons injured. *See, e.g.*, 12 *Couch on Insurance* § 172:13.

As we already have explained, we know from the context in which "accident" was used in *former* ORS 486.015 (1951) that the Oregon legislature did not intend that "accident" be interpreted in accordance with the "effects theory." That is so because the legislature explicitly provided that more than one person may be injured or killed in one "accident."

The other leading case in 1951 was *Hyer v. Inter-Insurance Exchange of Auto. Club of S. Cal.*, 77 Cal App 343, 246 P 1055 (1926). That case used what is referred to as the "cause theory" of interpretation. 12 *Couch on Insurance* § 172:12; 26 Fordham L Rev at 508-10 (discussing theory). *Hyer*, like *McCaleb*, involved the liability limits of an insurance policy—an automobile insurance policy. In *Hyer*, the insured's chauffeur negligently operated a car "which caused it to collide first with the Overland and then with the Cadillac." *Id.* at 346-47. The court explored the meaning of the contract term "accident" at length. The court considered both a "philosophical" interpretation of the term and its "ordinary and popular meaning," and concluded that the number of events that caused injury, not the number of persons injured, determined the number of accidents. *Id.* at 352. The court stated that "[w]here, as here, one negligent act or omission is the sole proximate cause, or *causa causens*, there is, as a general rule, but one accident, even though there be several resultant injuries or losses." *Id.* at 350.

In reaching that conclusion, the court considered a hypothetical situation in which, rather than being separately owned, the Overland and the Cadillac were owned by

one person who was using one car to tow the other when the "two automobiles were damaged in sudden and unexpected crashes happening in continuous sequence as a connected chain of events, but springing from a single initial cause." *Id.* Clearly, the court reasoned, it "would no more be correct to say of such a case that there were two accidents than it would be to predicate two or more accidents of a general freight train wreck, merely because two or more cars in the train might have been demolished in the same catastrophe." *Id.* The court concluded that the same rule should apply when the two cars were owned by two different people but were damaged, as in the hypothetical, in a "continuous sequence as a connected chain of events." *Id.* Accordingly, the court concluded that only one accident had taken place.

Labeling the analysis in *Hyer* as the "cause theory" of interpretation is useful in distinguishing the court's reasoning in *Hyer* from the reasoning in *McCaleb* and the "effects theory." However, in *Hyer*, there was only one negligent act and only one cause of the resulting damage to multiple vehicles. Therefore, the court did not decide how to interpret the term "accident" when a plaintiff's damages resulted from multiple causes, and that case does not aid us in ascertaining how the Oregon legislature would have viewed that question. The most we can draw from *Hyer* is that, when the legislature used the term "accident" in 1951, it would have been aware of that court's discussion of the "ordinary and popular meaning" of that term and its application of that term in the context of successive collisions.

When a disputed statutory term is undefined, we assume that it partakes of its ordinary meaning. *State v. Moss*, 352 Or 46, 48, 279 P3d 200 (2012). At the time that the Oregon legislature first used the term "accident," a leading case gave that term its ordinary meaning, and we have no reason to believe that the Oregon legislature used it in any different sense. We conclude that one "accident" means one event, happening, or occurrence.

We also conclude that, in applying that term, the legislature intended that a factfinder consider the cause or causes of successive collisions in determining whether more

than one "accident" occurred. That does not necessarily mean, however, that the legislature intended to equate the number of accidents with the number of causes. *Hyer* did not address the circumstance in which injuries result from multiple distinct causes, nor do the parties cite any case decided before 1951 that interpreted the term "accident" in that context.

Instead, both parties cite more recent cases applying the "cause theory." One of those cases is *Baggett*—the case from which the Court of Appeals drew its contractual interpretation. As noted, in *Baggett*, the court interpreted the term "accident" to mean a "single uninterrupted course of conduct" giving rise to injury and explained that, when the "original cause is interrupted or replaced by another cause, there is more than one 'accident.'" *Wright*, 253 Or App at 33 (quoting *Baggett*, 209 Cal App at 1393 (internal citations omitted)).

In *Baggett*, the plaintiffs' decedent was struck from behind by a tortfeasor. The two vehicles came to a stop in the center lane of the highway. While the drivers were examining the vehicles, and within a minute of the first collision, a second vehicle struck the stopped vehicles, killing the decedent. *Baggett*, 209 Cal App 3d at 1390. The decedent's heirs alleged that the initial tortfeasor was negligent in: (1) driving his vehicle; (2) stopping his vehicle without displaying hazard or operating lights, setting out reflective devices or flares, or directing traffic around the stopped vehicles; and (3) guiding the decedent to a position of danger. *Id.* The court stated that the governing interpretation of the term one "accident" was as follows:

> "In determining whether, under a particular set of circumstances, there was one accident or occurrence, the so-called 'causation' theory is applied. Hence a single uninterrupted course of conduct which gives rise to a number of injuries or incidents of property damage is one 'accident' or 'occurrence.' On the other hand, if the original cause is interrupted or replaced by another cause, then there is more than one 'accident' or 'occurrence.'"

*Baggett*, 209 Cal App at 1393 (quoting *State Farm Fire & Cas. Co. v. Kohl*, 131 Cal App 3d 1031, 1035, 182 Cal Rptr 720 (1982)).

To illustrate the distinction between one and more than one accident, the court in *Baggett* compared cases in which one negligent act had caused multiple collisions and courts had concluded that one accident had occurred with another case in which a court had concluded that two accidents had occurred, *Liberty Mutual Insurance Co. v. Rawls*, 404 F2d 880, 881 (5th Cir 1968). *Baggett*, 209 Cal App at 1393. In *Rawls*, the agreed facts established that the insured had collided first with the Rawls vehicle and then with a second vehicle, and that the two impacts were separated in both time and distance. The court stated:

> "These impacts occurred 2 to 5 seconds apart and 30 to 300 feet apart. There were two distinct collisions, or more than a single sudden collision. There is no evidence that the [insured's] automobile went out of control after striking the rear end of [Rawls'] automobile. On the contrary, the only reasonable inference is that [the insured] had control of his vehicle after the initial collision."

404 F2d 880.

Unlike the court in *Rawls*, in *Baggett*, the court apparently decided that the two collisions were part of "a single uninterrupted course of conduct." 209 Cal App at 1393. Without extensive analysis, the court in *Baggett* concluded that the "policy provisions limiting maximum liability 'for any one auto accident' unambiguously contemplate two consecutive collisions as occurred here to be one accident." *Id*. at 1396.

Other courts applying the "cause theory" of interpretation also have considered whether the damages at issue resulted from one "uninterrupted and continuing cause," or whether there was an intervening cause that resulted in two accidents. So, for instance, in *State Auto Property & Cas. Co. v. Matty*, 286 Ga 611, 690 SE2d 614 (2010), where the facts demonstrated that one negligent driver hit two bicyclists in rapid succession, the court explained that the determinative question was "whether, after the cause of the initial collision, the driver regained control of the vehicle before a subsequent collision, so that it can be said there was a second intervening cause and therefore a second accident." *Id*. at 614.

Similarly, in *Illinois Nat. Ins. Co. v. Szczepkowicz*, 185 Ill App 3d 1091, 1096, 542 NE2d 90 (1989), the court interpreted the term "accident" to mean a "single, uninterrupted cause" and concluded that the two collisions that took place in that case constituted two "accidents." In that case, the tortfeasor was driving a truck with inoperative lights in heavy fog. He stopped the truck in such a way that oncoming traffic was blocked. One vehicle collided with the truck; some five minutes later, another vehicle collided with the truck. The trial court determined that two accidents had occurred, and the appellate court affirmed, holding that, because

> "[t]wo separate, distinct collisions occurred five minutes apart [,]*** there was no single force, nor an unbroken or uninterrupted continuum that, once set in motion, caused multiple injuries [and] *** the second collision did not result from continuous or repeated exposure either to the same or to substantially the same conditions."

*Id.* at 1096-97. The court distinguished the case before it from cases where one vehicle "ricochets" off another in such a way that two collisions comprise a single accident. *Id.* at 1096. *See, e.g., Truck Ins. Exchange v. Rohde*, 49 Wash 2d 465, 470, 303 P2d 659 (1956) (tortfeasor lost control of his car and in rapid succession, without regaining control, collided with three motorcycles moving in "echelon formation"); *Olsen v. Moore*, 56 Wis 2d 340, 350, 202 NW2d 236 (1972) (tortfeasor's vehicle struck first car and was deflected into the second car; the collisions "occurred almost instantaneously").

Those cases had not been decided in 1951. Accordingly, they do not aid us in our task of statutory interpretation except to illustrate the various contexts in which a factfinder may be called on to apply the ordinary meaning of the term "accident" and whether more than one "accident" took place. One interpretation of those cases is that there are as many accidents as there are causes of injury. We do not believe, however, that those cases necessarily stand for that proposition or that the legislature intended "accident" to have that meaning.

Cause is a slippery concept with various meanings in various contexts. Whether an act or omission is a

cause in fact of an injury is a legal concept that is used in determining a person's tort liability. W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 41 at 264-65 (5th ed 1984). Just as the number of persons who are injured does not determine the number of accidents, neither does the number of tortfeasors who may be held liable for the injury. By the same token, a person's injuries may have multiple causes without necessarily being incurred in multiple accidents. For instance, a person may be injured in a collision with another car that is operated by a speeding driver who fails to stop in time not only because she is driving negligently, but also because the car has negligently manufactured, defective brakes. Although both the negligent driver and the defective brakes may be contributing causes of the person's injuries, there is only one collision—only one event, happening, or occurrence—and therefore only one accident. Thus, as a legal concept pertaining to liability, the number of causes of injury does not necessarily determine the number of accidents, and we do not believe that the Oregon legislature intended to equate the two.

Instead, we believe that the legislature intended that a factfinder consider the particular facts of each case and determine whether a person's injuries were incurred in one uninterrupted event, happening, or occurrence or whether an initial event, happening, or occurrence was interrupted in some way—such as by time or different causal act— permitting a factfinder to conclude that there was more than one distinct event, happening, or occurrence and therefore more than one "accident." As demonstrated by the cases discussed above, when separate acts are distinct factual causes of successive collisions, that may be an indication that there was a break in the chain of events sufficient to permit a jury or a court to conclude that more than one accident had occurred. However, that will not always be true.

Whether the circumstances in a particular case establish more than one "accident" ordinarily will be a question of fact. A court may determine that question as a matter of law only when a reasonable jury could reach only one conclusion. *See Jones v. Gen. Motors Corp.*, 325 Or 404, 414, 939 P2d 608 (1997) (judgment appropriate as a matter of

law only if jury would be compelled to return a particular verdict). In this case, we differ with the Court of Appeals as to whether that standard was met.

As noted, the undisputed evidence was that Turner, driving negligently, spun out of control and collided with the truck in which plaintiff was a passenger. The truck came to a stop on the median strip of the highway, resting against a concrete barrier that blocked the driver's side door. Before the second collision occurred, the driver had time to climb out her window, check on Turner, return to the truck, and ask plaintiff to retrieve her cell phone. During that interval, a number of other drivers passed the truck without mishap; however, Oliver, who also was driving negligently, did not, and a second collision occurred.

The Court of Appeals reasoned that plaintiff had the burden to prove the availability of coverage for two accidents and that she had failed to "adduce *prima facie* evidence that the second collision was not merely proximately derivative of the causation of the first" because "the record is completely devoid of any evidence regarding the cause of the second collision." *Id*. at 37. We reach a different conclusion.[10] It is undisputed that, after the first collision, the truck in which plaintiff was riding came to rest on the median strip and that there was an intervening period of time during which a number of vehicles passed by without incident. The second collision occurred when Oliver's vehicle struck the truck, and defendant admitted that Oliver was negligent in doing so. Those facts constitute some evidence that Oliver's driving was a cause of the second collision, and were at least sufficient to give rise to a jury question on that issue.

We do not fully understand the Court of Appeals' further reasoning that the evidence showing more than "one accident" nevertheless was deficient because plaintiff failed to prove that the second collision was "not merely proximately derivative" of the first. *Id*. The fact that Turner's negligence set the injurious events in motion and therefore could have contributed not only to the injuries that plaintiff

---

[10] It is not necessary for us to decide whether the Court of Appeals was correct in its allocation of the burden of proof, and we do not address that question. We reason from the undisputed evidence presented at trial.

suffered in the first collision but also to the injuries that plaintiff suffered in the second collision may bear on the extent of Turner's liability. However, Turner's potential liability for plaintiff's injuries does not determine the number of accidents that occurred. That determination depends solely on whether the chain of events that began with Turner's negligence was in some way interrupted (such as by time, distance, cause, or a combination of the three), such that a jury reasonably could conclude that the second collision constituted a second event, happening, or occurrence, and therefore a second accident.

We doubt that the Court of Appeals intended to introduce the concept of "proximate" or "legal" cause (as opposed to "cause in fact" or "factual" cause), into the "accident" analysis, but we think it advisable to specifically caution that "proximate cause" has no bearing on the question of how many accidents occurred. In *Hyer*, the court mentioned "proximate cause" and courts in other jurisdictions continue to use that concept to refer to whether a tortfeasor may be held legally responsible in tort for the consequences of a negligent act. "Proximate cause" is defined as a "cause that is legally sufficient to result in liability; an act or omission that is considered in law to result in a consequence, so that liability can be imposed on the actor." *Black's Law Dictionary* 234 (8th ed 2004). As Prosser explains, "legal responsibility must be limited to those causes which are so closely connected with the result and of such significance that the law is justified in imposing liability. Some boundary must be set to liability for the consequences of any act * * *." *Prosser and Keeton* § 41 at 264. In Oregon, we determine that boundary by whether the consequential injury is foreseeable. *Lasley v. Combined Transport, Inc.*, 351 Or 1, 7, 261 P3d 1215 (2011). But no matter how legal liability is determined, that concept is distinct from the question presented here. The question that we confront in this case is not whether Turner or Oliver could be held liable for plaintiff's injuries—they have been. The question is whether they injured plaintiff in one "accident" or in two.

We conclude that plaintiff presented evidence that was at least sufficient to give rise to a jury question on that

issue.[11] The trial court erred in not presenting that question to the jury, and we therefore remand this case to the trial court for that factual determination.

The decision of the Court of Appeals is reversed. The judgment of the circuit court is reversed, and the case is remanded to the circuit court for further proceedings.

---

[11] Plaintiff asks that we decide the number of accidents that occurred in this case as a matter of law, and the Court of Appeals noted that "the parties agree[d] that, as framed on this record, the determination of whether plaintiff's injuries were the result of a single 'accident' *** is purely legal and does not implicate any material factual dispute." 253 Or App at 29. However, plaintiff did not file a motion in the trial court asking that it decide the issue as a matter of law, and the parties cannot, by agreement, make a question of fact into a question of law or have an appellate court decide an issue that was not presented at trial.